THE CITY OF PERU, Petitioner-Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

Third District No. 3—87—0189

Opinion filed January 27, 1988.—Rehearing denied April 19, 1988.

Gary S. Kaplan, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (John T. Weise, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Valerie J. Peiler, Assistant Attorney General, of Chicago, of counsel), for respondents Illinois State Labor Relations Board, William M. Brogan, Robert J. Hilliard, and Claire A. Manning.

Anne Wells Clark, of Asher, Pavalon, Gittler & Greenfield, Ltd., of Chicago (Joel D'Alba, of counsel), for respondent Illinois Fraternal Order of Police.

James A. Murphy, of Peoria, and Thomas W. Kelty, of Pfeifer & Kelty, P.C., and Gregory A. Crouse, both of Springfield, for amici curiae Illinois Association of Police Chiefs and the Illinois Municipal League.

JUSTICE HEIPLE delivered the opinion of the court:

The respondent, Peru Fraternal Order of Police Lodge No. 137 (Union), filed a petition with the respondent, Illinois State Labor Relations Board (Board), seeking to represent a bargaining unit composed of police officers in the City of Peru below the rank of chief, *i.e.*, four

lieutenants, two sergeants and 13 patrolmen. The Board's hearing officer concluded that the four lieutenants and two sergeants are supervisors as defined by the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1603(r)) (Act), and therefore, cannot be included in the bargaining unit. In a 2 to 1 decision, the Board reversed the hearing officer's recommendation and held that the lieutenants and sergeants are not supervisors, and thus, can be included in the bargaining unit.

In order to secure judicial review of the Board's inclusion of the lieutenants and sergeants in the bargaining unit, the City of Peru (City) refused to bargain with the Union. After summary unfair labor practice proceedings before the Board, the City petitioned this court for review. The sole issue on appeal is whether the Board correctly found that the lieutenants and sergeants are not supervisors within the meaning of the Act. We find the Board's decision incorrect, and accordingly, reverse.

■■ This is a case of first impression in Illinois and there was much discussion by the parties concerning the proper scope of review. The Act provides that judicial review of a decision by the Board may be sought in accordance with the provisions of the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 *et seq.*), except that it shall go directly to the appellate court. (Ill. Rev. Stat. 1985, ch. 48, par. 1611(e).) The Administrative Review Law provides the review shall extend to all questions of law and fact presented by the entire record. It further provides the findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) However, where the findings of fact are against the manifest weight of the evidence, and it is clearly evident the Board should have reached the opposite conclusion, the reviewing court has the authority to reverse. (*Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863.) Further, where the question involved is one of law, such as the proper interpretation of a statute, the Board's finding is not binding on the court. The resolution of the issue in the instant case involves both the interpretation of statutory language and questions of fact.

The Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1601 *et seq.*) is a comprehensive statute designed to govern labor relations for a significant number of public employees. It establishes a duty for a public employer to bargain collectively with the exclusive representative of a unit of public employees. For purposes of the instant case, the Act's provisions for establishing a bargaining

unit are pertinent. In most instances, a bargaining unit determined by the Board may not include both supervisors and nonsupervisors. (Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).) The Act defines "supervisor" as follows:

" 'Supervisor' is an employee whose principal work is substantially different from that of his subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, or to adjust their grievances, or to effectively recommend such action, if the exercise of such authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment. Except with respect to police employment, the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising such authority State supervisors notwithstanding. In addition, in determining supervisory status in police employment, rank shall not be determinative. The Board shall consider, as evidence of bargaining unit inclusion or exclusion, the common law enforcement policies and relationships between police officer ranks and certification under applicable civil service law, ordinances, personnel codes or Division 2.1 of Article 10 of the Illinois Municipal Code, as amended from time to time, but these factors shall not be the sole or predominant factors considered by the Board in determining police supervisory status." Ill. Rev. Stat. 1985, ch. 48, par. 1603(r).

■ Thus, in determining if an employee is a supervisor within the meaning of the Act, it must first be decided whether the employee's principal work is substantially different than that of his subordinates. In the instant case, the Board found that the work of three lieutenants in the Peru police department was substantially different than that of their subordinates. It did not address the issue as to the fourth lieutenant or the two sergeants since it found they failed the test for other reasons. An explanation of the functions and duties of all the officers in the Peru police department is necessary at this juncture for our determination of this issue.

The sworn officers of the Peru police department comprise a total of 21 individuals: a chief of police, a lieutenant-investigator, four lieutenants, two sergeants, and 13 patrolmen. The department also employs two clerks and a secretary. The department operates in a military fashion and follows a strict chain of command, meaning subordinate employees must obey without equivocation their superior officers. Department rules and regulations define lieutenants and ser-

geants as superior officers. Patrolmen are defined as subordinate officers.

The general administration, supervision and control of the police department is vested in Chief of Police White (the Chief), who is directly answerable to the mayor. The Chief works regular business hours Monday through Friday, but the department is in continuous operation. Accordingly, the other officers are divided into three shifts. Each shift is headed by either Lieutenant Harris, Lucas, or Znaniecki, the three shift commanders. Each shift also has a shift supervisor, either Lieutenant Andreoni, Sergeant Buczkowski, or Sergeant Mertel, and a certain number of patrolmen. When the shift commanders are off duty, the shift supervisors assume the role of shift commander; thus, they are also referred to as part-time shift commanders. The Chief testified that he spends "[v]ery, very little" time supervising the patrolmen or clerks, and in reference to the full- and part-time shift commanders he stated, "The shift commanders run the department."

The full-time shift commanders spend virtually all of their time at the police headquarters running the operations of the department. In addition to supervisory duties which will be discussed below, the shift commanders' responsibilities include operating the radio transmitter, dispatching patrolmen, booking persons arrested, handling walk-in reports and inquiries, and reviewing patrolmen's reports. They also perform various managerial tasks such as keeping logs and completing daily activity sheets. The Board found that the full-time shift commanders meet the first prong of the test for supervisory status.

The part-time shift commanders perform the functions of the full-time shift commanders 50% of the time. When they are not performing the functions of the full-time shift commanders, they serve as shift supervisors. As shift supervisors, they patrol the city in the designated sergeant's car, overseeing all outside activities and supervising the patrolmen.

The patrolmen's duties can be broken down into six basic functions. They are patrolling the streets, operating a radar gun, responding to dispatches received by the shift commander, issuing traffic tickets, effecting arrests, preparing police reports, and performing court duty.

We believe the above explanation of the officers' duties and functions establishes the substantial difference between the part-time shift commanders' work and the patrolmen's work. Initially, it is clear that 50% of the time the part-time shift commanders' work is substantially different than that of the patrolmen since it is spent performing the same functions of the full-time shift commanders. Though the other

50% of the time is spent patrolling the streets similarly to patrolmen, the similarity of the part-time shift commanders' duties and the patrolmen's duties ends there. For unlike patrolmen, the part-time shift commanders are not assigned a specific beat, never run a radar gun, never respond to a call except as a backup or when all patrolmen are occupied, and therefore, virtually never file a report, issue tickets or make arrests. Additionally, the part-time shift commanders exercise supervisory authority not possessed by the patrolmen, as will be discussed below.

■ The second step of the test provides that in order to be a supervisor the employee must have the "authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, or to adjust their grievances, or to effectively recommend such action." (Ill. Rev. Stat. 1985, ch. 48, par. 1609(b).) The second prong of the supervisor test was adopted from the National Labor Relations Act's definition of "supervisor." (29 U.S.C. §152(11) (1976).) Therefore, National Labor Relations Board precedent is useful in analyzing the second prong of the Illinois test for supervisory status. Federal case law provides that the use of the disjunctive "or" in enumerating the 11 supervisory functions establishes the second part of the test is met as long as the individual performs any one of those functions. (*Maine Yankee Atomic Power Co. v. NLRB* (1st Cir. 1980), 624 F.2d 347.) We agree with the First Circuit's reasoning.

Before discussing the enumerated supervisory functions further, we deem it important to note no one within the Peru police department has the authority to hire, lay off, recall, promote, discharge, or reward other officers, since that power is vested by Illinois statute in the board of fire and police commissioners. (Ill. Rev. Stat. 1985, ch. 24, par. 10—2.1—1 *et seq.*) Of the remaining indicia of authority, the Board only discussed whether the employees in question have the authority to effectively recommend suspensions. The Board found that though the lieutenants and sergeants have authority to recommend suspensions, the recommendations are ineffective because the Chief independently investigates and reviews the recommendations. More specifically the Board stated:

"The record demonstrates *** that either the Chief or Lieutenant Mayszak, the Department's investigator, performs an independent investigation into the facts surrounding *all* recommended discipline, even written reprimands, to determine whether the charges are correct. In the course of such investigation, the Chief (or the investigator) may interview witnesses,

if any, and asks the accused for his version of events. The Chief makes credibility resolutions concerning any differing version of events, and, at the close of the investigation, weighs the facts and decides whether discipline should be imposed.

* * *

The exhaustive nature of the Chief's investigations indicates to us that he does not rely upon the sergeants' and lieutenants' versions of the facts; rather, he independently determines what transpired and only then determines what, if any, discipline is appropriate. In this circumstance, we cannot conclude that the recommendations are effective; rather it is more that the sergeant or lieutenant reports an incident, triggering review by the Chief."

The Board's finding in regard to the procedure followed by the Chief upon a recommendation of suspension belies the record. The Chief stated that he normally reviewed such recommendations, not the department's investigator. The review consists of asking the person to be disciplined for his written or oral account of the incident. The review neither normally involves interviewing other witnesses nor "exhaustive" investigation. The record further indicates that, in all but one instance, the Chief fully followed the recommendations, even when he personally believed a suspension was too harsh a sanction. That suspensions were in fact meted out in accordance with the recommendations in all but one instance evidences the effectiveness of the recommendations. (See *Eastern Greyhound Lines v. NLRB* (6th Cir. 1964), 337 F.2d 84.) Thus, the Board's finding that the recommendations are ineffective is against the manifest weight of the evidence.

Further, as a matter of law, we refuse to find that a recommendation is ineffective simply because it is not rubber-stamped. The term "recommendation" implies some form of review by the person to whom the recommendation is made. As the Board conceded in its opinion, in the paramilitary-style police environment, with its emphasis upon a structured chain of command, it would be highly unlikely that a disciplinary recommendation would not be subject to review by higher authority.

■ The third step of the test, which was also adopted from the National Labor Relations Act's definition of "supervisor," provides the exercise of one or more of the 11 enumerated functions must require the consistent use of independent judgment. The Board conceded the lieutenants and sergeants use independent judgment in recommending suspensions. Thus, we need not address the issue further. Though the discussion to this point is sufficient for our holding that

the lieutenants and sergeants are supervisors within the meaning of the Act, we will address the City's argument that the lieutenants and sergeants also possess the authority to discipline and direct their subordinates, and that they use independent judgment in doing so.

The departmental rules and regulations provide lieutenants/shift commanders have the same general responsibilities as sergeants. One of the general responsibilities of a sergeant is the development and maintenance of discipline and morale. Article VI of the rules and regulations regards departmental discipline and provides:

"2. <u>Departmental</u> <u>Authority</u> <u>to</u> <u>Discipline.</u> Final departmental disciplinary authority and responsibility rest with the Chief of Police. Other supervisory personnel may take the following disciplinary measures:

—Oral reprimand.

—Written reprimand (subject to approval by the Chief of Police).

—Emergency suspension.

—Written recommendation for other penalties.

3. <u>Emergency</u> <u>Suspension.</u> The following personnel have the authority to impose emergency suspension until the next business day against a member or employee when it appears that such action is in the best interests of the Department:

—The Chief of Police

—The Lieutenant of Police

—Any Sergeant."

Though the department's rules and regulations standing alone are insufficient to establish the lieutenants' and sergeants' exercise of disciplinary authority, they should not be ignored or treated lightly. It is significant that the City recognized the supervisory status of rank officers and granted them authority to take certain actions.

The effectiveness of the departmental rules and regulations as set forth above was established by the testimony of Lieutenant Andreoni. He testified that, without first consulting the Chief, he took the disciplinary step of orally forbidding a department clerk from taking time off while working on his shift. Upon learning of the lieutenant's action, the chief said it was "fine with him." After he took the intermediary disciplinary step of orally reprimanding the insubordinate clerk, the lieutenant recommended the clerk receive a written reprimand. The Chief agreed with the recommendation, and the reprimand was issued. There was other uncontroverted testimony of the use of oral reprimands and their effectiveness. Though the oral reprimands are not made part of the employees' files, the Chief stated that when

considering a patrolman for promotion he consults with his supervising lieutenants and sergeants and takes into account any oral reprimands.

That the lieutenants and sergeants in the instant case do not exercise their disciplinary authority frequently does not destroy the existence or the effectiveness of the authority, as the Board suggests. In this regard, the fourth prong of the test for supervisory status provides:

> *"Except with respect to police employment,* the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising such authority State supervisors notwithstanding."* (Emphasis added.)

By eliminating the "preponderance test," the legislature relaxed the requirements for supervisory status in police employment. The relaxed standard may have been adopted to reflect a view that in a paramilitary organization the need to outright exercise supervisory authority is lessened. It could also reflect the fact that supervision in smaller police departments does not take much time, with the result that supervisory officers spend much of their time performing duties similar to those of subordinate officers. Whatever the legislature's rationale was for eliminating the preponderance test in the police employment context, it is the existence of the supervisory authority, and exercise of it when needed, that is essential, not the amount of time such authority is exercised. (*Arizona Public Service Co. v. NLRB* (9th Cir. 1971), 453 F.2d 228.) Here, the supervisory disciplinary authority exists, and it was exercised when needed.

We also agree with the City that the lieutenants and sergeants have supervisory authority to direct their subordinates. Again, in this regard, the department's rules and regulations provide that lieutenants/shift commanders have the same general responsibilities as sergeants. The general duties of sergeants include:

> "(1) Command—the direction and control of individuals under his command to assure the proper performance of duties and adherence to established rules and regulations, policies and procedures of the Department.
>
> * * *
>
> (5) Organization and Assignment—Of duties to assure prompt performance of department functions and those of the command."

The specific duties of sergeants include:

> "(1) Supervision. Closely supervising the activities of subordinates, making corrections where necessary and commending

where appropriate;

\* \* \*

(3) <u>Direction</u>. Exercise direct command in a manner that assures the good order, conduct, discipline, and efficiency of subordinates \*\*\*;

(4) <u>Enforcement</u> <u>of</u> <u>Rules</u>. Enforcement of department rules and regulations, general and special orders, and requiring compliance with Department policies and procedures."

The record establishes that the supervisory authority of direction is used regularly. For instance, at the beginning of each shift the lieutenant or sergeant shift commander may assign the subordinate officers to a particular beat. This may be a general assignment, such as the north or south side of town, or a more specific assignment, such as a school zone or business district. The shift commander may also direct a patrolman to operate a speed gun at a particular intersection for a certain length of time, to abandon the squad car and foot patrol an area, or observe a particular area from a stationary position. The full- or part-time shift commander may also order the men on his shift to work beyond the end of the shift. This has been done when a shift has been particularly busy, or there has been a serious accident, and there are reports to be finished, people to be taken to the hospital, and other pertinent matters to be completed. Further, a shift commander may order the next shift or certain patrolmen from the next shift to report for duty early. If a shift is shorthanded, the shift commander may elect to run the shift shorthanded in circumvention of departmental rules, or order a patrolman from another shift to work the short shift as well as his regular shift. Additionally, shift commanders may direct when a patrolman takes compensation time. A patrolman is entitled to compensation time when he has worked overtime without pay. It was established that one shift commander will not allow compensation time to be taken on certain days.

All of these decisions of direction and command are left to the discretion of the shift commanders in deciding how to run their respective shifts, and thus, involve the consistent use of independent judgment, despite the Union's and Board's contentions to the contrary. The Union and Board argue that because the authority of the lieutenants and sergeants is so circumscribed by directives, rules, and regulations, the officers exercise merely routine or clerical judgment in making decisions. We find this argument simplistic. It ignores the role of the lieutenants and sergeants in safely and efficiently orchestrating their shifts in accordance with the rules and regulations, in choosing which rules or regulations should be followed under a variety of cir-

cumstances, and their role in electing to forego the rules and regulations in certain situations. Further, there cannot possibly be written procedures for every possible contingency which the full- and part-time shift commanders might face. The record establishes the lieutenants' and sergeants' exercise of independent judgment, and though the judgment is informed by strict training and written procedures, it is judgment nonetheless; "it is not simply the conditioned reflex of an automaton." *Maine Yankee Atomic Power Co. v. NLRB* (1st Cir. 1980), 624 F.2d 347.

For the foregoing reasons, the judgment of the Illinois State Labor Relations Board is reversed.

Reversed.

BARRY, P.J., and WOMBACHER, J., concur.