NO.  4-09-0792          Filed 12/28/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE DEPARTMENT OF CENTRAL MANAGEMENT | ) | Direct Administrative |
| SERVICES/ILLINOIS COMMERCE COMMISSION, | ) | Review of the Illinois |
| Petitioner-Appellant, | ) | Labor Relations Board, |
| v. | ) | State Panel |
| THE ILLINOIS LABOR RELATIONS BOARD, | ) | Nos. S-RC-10-034 |
| STATE PANEL; JACKIE GALLAGHER, MICHAEL | ) | S-RC-10-036 |
| HADE, REX PIPER, MICHAEL COLI, and ALBERT | ) | |
| WASHINGTON, the Members of Said Board and | ) | |
| Panel in Their Official Capacity Only; JOHN F. | ) | |
| BROSNAN, in His Official Capacity Only as ILRB | ) | |
| Executive Director; Administrative Law Judge | ) | |
| ELLEN MAUREEN STRIZAK, in Her Official | ) | |
| Capacity Only; and the AMERICAN FEDERATION | ) | |
| OF STATE, COUNTY, AND MUNICIPAL | ) | |
| EMPLOYEES, COUNCIL 31, | ) | |
| Respondents-Appellees. | ) | |

JUSTICE APPLETON delivered the opinion of the court:

The Illinois Department of Central Management Services (CMS) seeks review of a decision by the Illinois Labor Relations Board, State Panel (Board), certifying the American Federation of State, County, and Municipal Employees, Council 31 (union), as the exclusive representative of one Administrative Law Judge IV (ILRB case No. S-RC-10-034) and seven Administrative Law Judge IIIs (ILRB case No. S-RC-10-036) (the ALJs), all of whom work at the Illinois Commerce Commission (Commission). CMS complains that the Board reached a decision solely on the basis of written submissions, without giving CMS an opportunity for an oral hearing, including the examination of witnesses.

We agree with CMS that the denial of an oral hearing was clearly erroneous

because there is an unresolved issue as to whether the eight ALJs in question are managerial employees. It appears that, like managerial employees, the ALJs make effective recommendations. According to the position statement that CMS submitted to the Board, the Commission almost always accepts the ALJs' recommended orders, without modification, and these recommended orders, adopted by the Commission, are the means by which the Commission fulfills its statutory mission of regulating public utilities. As far as we can see from the record, the Board's investigation yielded no basis for questioning the position statement in that regard. In short, the position statement describes the ALJs as exerting great influence within the Commission, and we do not understand either the union or the Board as contending otherwise. We have a firm and definite conviction that the certification of the union as the bargaining representative of the eight ALJs was premature because there is still a live question as to whether they are managerial employees. We do not purport to resolve that question one way or the other; instead, the Board should do so. Therefore, we reverse the Board's decision and remand this case for further proceedings.

## I. BACKGROUND

On July 28, 2009, the union filed two majority-interest petitions, in which it requested to be certified as the exclusive representative of the eight ALJs.

On July 29, 2009, Lori Novak, an assistant of the Board's Executive Director, John F. Brosnan, wrote a letter to Greg Newton, the acting deputy general counsel for CMS at the time, asking him to file responses to the two majority-interest petitions. Newton said that these responses had to "include any issues [CMS] intend[ed] to raise concerning *** whether any employees sought by the petitioner should be excluded from the unit."

### A. CMS's Initial Position Statement

In its initial response, or position statement, filed on August 14, 2009, CMS contended that the ALJs should be excluded from the bargaining unit because they were managers and, as such, were ineligible to participate in collective bargaining. Essentially, CMS gave three reasons why the ALJs should be considered managers. First, the ALJs worked in the realm of policy. They conducted quasi-judicial hearings that involved rule-making, rates, citations, complaints, certificates, financial agreements, and the issuance of securities, and by issuing recommended orders in these matters, the ALJs created the policies of the Commission. Second, the ALJs' recommendations were "effective" in that the Commission "rarely rejected" them. Third, the ALJs were managerial as a matter of law because section 2-106(a) of the Public Utilities Act (220 ILCS 5/2-106(a) (West 2008)) required the executive director of the Commission to employ them.

B. The Order To Show Cause

On August 14, 2009, an ALJ of the Board, Ellen M. Strizak, wrote in a letter to the parties that she had reviewed CMS's position statement of August 14, 2009, and that she had found nothing therein that warranted the convening of a hearing. Accordingly, she ordered CMS to show cause, by no later than September 9, 2009, as to why the union should not be certified as the bargaining representative of the eight employees in question. She cautioned that to support its claim of a statutory exclusion, CMS could not "rely[] on vague, generalized testimony or contentions as to an employee's job function" but that, instead, CMS had to "present specific examples of the alleged managerial authority," including "all documentary evidence and affidavits[] which support[ed] [CMS's] position." Further, all documentation had to be accompanied by an explanation of the following: (1) what the documentation was, (2) what the documentation purported to show, and (3) why

the information in each document supported CMS's claim that the petitioned-for employees were managerial.

### C. CMS's Supplemental Position Statement

On September 9, 2009, in response to Strizak's order to show cause, CMS filed a supplemental position statement, which had attached to it as exhibits A through F 1,785 pages of orders issued by the Commission in 13 public-utility cases. According to CMS, the eight ALJs wrote these orders as recommendations to the Commission, and in all but one case, the Commission adopted the orders without modification.

In its supplemental position statement, CMS said that by the "conservative estimate" of the chief ALJ of the Commission, the Commission adopted the ALJ's recommendations 95% of the time. "Substantive modifications [were] rare[,] and outright reversals [were] even rarer." According to CMS, the ALJs had "a direct hand in formulating policy through the preparation of orders to the Commission. This reliance on the ALJs to set up the language of the policies that the Commission want[ed] to implement as well as to see that past policy [was] followed support[ed] the Employer's position that these ALJs [met] the managerial exclusion," CMS argued.

### D. Certification of the Union

On September 9, 2009, Strizak wrote the parties that she had reviewed CMS's response to the majority-interest petitions and that she had found "no issues of law or fact in these matters." Consequently, she announced that she would recommend to the Board's Executive Director that he certify the union.

On September 10, 2009, Brosnan prepared tallies of majority interest and certified the union as the exclusive representative of the eight ALJs employed at the

Commission, ordering their inclusion in the union's existing RC-10 bargaining unit.

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

On appeal, we ask whether the Board committed clear error by deciding that an oral hearing was unnecessary. City of Chicago v. Illinois Labor Relations Board, Local Panel, 396 Ill. App. 3d 61, 72, 918 N.E.2d 1103, 1113-14 (2009), appeal denied, 236 Ill. 2d 502, 930 N.E.2d 407 (2010); Illinois Council of Police v. Illinois Labor Relations Board, Local Panel, 387 Ill. App. 3d 641, 658, 899 N.E.2d 1199, 1213 (2008). (We use the term "oral hearing" because the denial of an oral hearing is not necessarily the denial of a hearing: a hearing could be "written" in the sense that parties could be heard solely through their presentation of written arguments and documentary evidence to the agency. See Lawless v. Central Production Credit Ass'n, 228 Ill. App. 3d 500, 515, 592 N.E.2d 1210, 1219 (1992); Lewis v. Superior Court, 19 Cal. 4th 1232, 1248-49, 970 P.2d 872, 884, 82 Cal. Rptr. 2d 85, 97 (1999); Black's Law Dictionary 737 (8th ed. 2004) (defining a "hearing" in the administrative-law context as "[a]ny setting in which an affected person presents arguments to an agency decision-maker").) Under this standard of clear error, we will uphold the Board's decision unless our review of the entire record leaves us with " ' " 'the definite and firm conviction that a mistake has been committed.' " ' " City of Chicago, 396 Ill. App. 3d at 72, 918 N.E.2d at 1114, quoting Illinois Council of Police, 387 Ill. App. 3d at 658, 899 N.E.2d at 1213, quoting AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

### B. Lengthy Quotations

Reading the argument of CMS's brief, we encounter page after page of lengthy single-spaced block quotations. Although Illinois Supreme Court Rule 341(a) allows the single-spacing of quotations that are two or more lines long, the rule warns that "lengthy quotations are not favored and should be included only where they will aid the court's comprehension of the argument." Official Reports Advance Sheet No. 15 (July 16, 2008), R. 341(a), eff. July 1, 2008. Long quotations are difficult to read, especially if they are single-spaced, and we remind CMS to avoid them in its brief whenever possible.

### C. A Fair Hearing

#### 1. The State Has No Constitutional Right to Due Process

CMS argues that "the failure to provide an evidentiary hearing, and the opportunity for review before the State Panel of the ILRB unfairly deprived the State of its right to a hearing and/or due process." CMS cites Niles Township School District 219 v. Illinois Educational Labor Relations Board, 369 Ill. App. 3d 128, 136, 859 N.E.2d 57, 64 (2006), in which the First District held that by making a decision in a case without first conducting an evidentiary hearing, the Illinois Educational Labor Relations Board violated a school district's "procedural[-]due[-]process rights."

"Procedural due process" means "[t]he minimal requirements of notice and a hearing guaranteed by the Due Process Clauses of the 5th and 14th Amendments." Black's Law Dictionary 539 (8th ed. 2004). We disagree with the First District that a school district, a political subdivision of the state (People ex rel. Taylor v. Camargo Community Consolidated School District No. 158, 313 Ill. 321, 325, 145 N.E. 154, 155 (1924)), has a right to "procedural due process," a term generally understood as denoting a constitutional right

- 6 -

to certain minimal procedures (<u>People v. R.G.</u>, 131 Ill. 2d 328, 342, 546 N.E.2d 533, 540 (1989); <u>In re J.R.</u>, 341 Ill. App. 3d 784, 795, 793 N.E.2d 687, 696 (2003); Black's Law Dictionary 539 (8th ed. 2004)).  The Supreme Court of Illinois has held that "a school district, in its capacity as a political subdivision of the state, has no due process rights." <u>Henrich v. Libertyville High School</u>, 186 Ill. 2d 381, 405,  712 N.E.2d 298, 310 (1998).

A state and the political subdivisions of a state have no constitutional right to due process, because they are not "persons" within the meaning of the due-process clause of the fifth amendment (U.S. Const., amend. V).  <u>South Carolina v. Regan</u>, 465 U.S. 367, 394, 79 L. Ed. 2d 372, 391, 104 S. Ct. 1107, 1122 (1984) (O'Connor, J., concurring); <u>South Carolina v. Katzenbach</u>, 383 U.S. 301, 323-24, 15 L. Ed. 2d 769, 784, 86 S. Ct. 803, 816 (1966).  The same would seem to hold true of the due-process clause of the fourteenth amendment (U.S. Const., amend. XIV).  Hence, we conclude that the state and the political subdivisions of the state--including CMS and the Commission--have no constitutional right to due process.

2. <u>The</u> <u>Board's</u> <u>Compliance</u> <u>With</u> <u>Its</u> <u>Own</u> <u>Rules</u>

Even though CMS lacks a constitutional right to due process, it can insist on the Board's compliance with its own rules.  Administrative rules have the force and effect of law, and an agency must follow its own rules.  <u>People v. Scates</u>, 393 Ill. App. 3d 566, 570, 914 N.E.2d 243, 245 (2009); <u>Springwood Associates v. Health Facilities Planning Board</u>, 269 Ill. App. 3d 944, 948, 646 N.E.2d 1374, 1376 (1995).  In this case, CMS contends that by failing to conduct an oral hearing, with the presentation of live witnesses, the Board violated its own rules and therefore violated the law.  To evaluate that contention, we first will turn to section 1210.100(b) of the Board's rules (80 Ill. Adm. Code §1210.100(b), as

amended by 28 Ill. Reg. 4172, 4190-94 (eff. February 19, 2004)), a section that describes the procedural steps leading up to an oral hearing on a majority-interest petition as well as the conditions in which the Board is required to hold such a hearing.

According to section 1210.100(b)(3) (80 Ill. Adm. Code §1210.100(b)(3), as amended by 28 Ill. Reg. 4172, 4190 (eff. February 19, 2004)), the first step for the employer is to file a "written response" to the majority-interest petition within 14 days after service of the petition. Subsection (b)(3) also calls this "response" a "position statement." 80 Ill. Adm. Code §1210.100(b)(3), as amended by 28 Ill. Reg. 4172, 4190 (eff. February 19, 2004). As the name implies, all the position statement must do is set forth the employer's "position with respect to the matters asserted in the petition," including (if the employer knows) whether any of the individuals whom the petitioner seeks to represent should be excluded from the bargaining unit. 80 Ill. Adm. Code §1210.100(b)(3), as amended by 28 Ill. Reg. 4172, 4190 (eff. February 19, 2004). Only if the employer alleges that the majority support was obtained through fraud or coercion must the employer initially provide any evidence in support of its position, and this evidence of fraud or coercion must be clear and convincing. 80 Ill. Adm. Code §1210.100(b)(3), as amended by 28 Ill. Reg. 4172, 4190 (eff. February 19, 2004).

After the employer files its position statement--supported or unsupported by evidence, depending on whether the employer alleges fraud or coercion--the Board "or its agent," i.e., an ALJ, will investigate the union's majority-interest petition. 80 Ill. Adm. Code §1210.100(b)(6), as amended by 28 Ill. Reg. 4172, 4191 (eff. February 19, 2004). If the investigation uncovers a potential weakness or insufficiency in either party's case, the ALJ may order the party to provide evidence supporting its position. Section

- 8 -

1210.100(b)(6) provides: "[I]f, for any reason during the investigation, the Board or its agent discovers that the employer's objections to the majority interest petition are insufficient in either law or fact, the Board or its agent may issue an order to show cause requesting that the employer or union provide sufficient evidence to support its defenses." 80 Ill. Adm. Code §1210.100(b)(6), as amended by 28 Ill. Reg. 4172, 4191 (eff. February 19, 2004). The wording of that sentence is somewhat enigmatic because it is unclear why the union should have to provide supporting evidence if the problem is with the employer's objections. Nevertheless, the basic idea appears to be that if, in the course of his or her investigation, the ALJ encounters what appears to be a legal or factual deficiency in either party's case, the ALJ can require the party to shore up the deficiency by the submission of "sufficient evidence."

One may reasonably infer that the goal behind this investigative procedure is to discover ahead of time, through documentary submissions, any fatal deficiency in either party's case instead of discovering the deficiency later on, after wasting time and resources in an administrative "trial." In this respect, the procedure in section 1210.100(b) is comparable to a summary-judgment procedure, except that the ALJ, rather than the parties, identifies the weakness that needs to be shored up. See 735 ILCS 5/2-1005 (West 2008); Kimbrough v. Jewel Cos., Inc., 92 Ill. App. 3d 813, 819, 416 N.E.2d 328, 333 (1981) (the benefits of the summary-judgment procedure "inure not only to the litigants, in the saving of time and expenses, but to the community in avoiding congestion of trial calendars and the expenses of unnecessary trial").

Thus, the ALJ can call on the parties to assist in the investigation by supplying evidence to overcome or eliminate apparent problems, factual or legal, that the

investigation discloses. If the problem is with a "defense," "[f]ailure to provide sufficient evidence" in response to a rule to show cause can result in a "waiver" (or, to use the correct term, forfeiture) of that defense. 80 Ill. Adm. Code §1210.100(b)(6), as amended by 28 Ill. Reg. 4172, 4191-92 (eff. February 19, 2004).

This collaborative investigation will culminate in one of three outcomes: (1) dismissal of the petition (80 Ill. Adm. Code §1210.100(b)(7)(A), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004)), (2) certification of the petitioner as bargaining representative (80 Ill. Adm. Code §1210.100(b)(7)(B), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004)), or (3) the scheduling of an oral hearing (80 Ill. Adm. Code §1210.100(b)(7)(C), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004)). As in summary-judgment procedure, an oral hearing, or administrative "trial," is necessary only if the opposing documents (and any resulting procedural forfeiture) fail to resolve an important question about the petition--or, in the language of the rule, only if "the investigation discloses that there is reasonable cause to believe that there are unresolved issues relating to the question concerning representation." 80 Ill. Adm. Code §1210.100(b)(7)(C), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004). Thus, the Board shall hold an oral hearing only if it has reasonable grounds for believing that the case presents unresolved issues, significant questions that have resisted resolution through the written submissions.

Having described the procedure that the Board was to follow in this case, we now turn our attention to the substantive law upon which that procedure operates. This is the law relating to "managerial employees."

D. Managerial Status

CMS maintains that the sought-after employees, the eight ALJs employed at the Commission, are managerial employees. Whether the eight ALJs are managerial employees is of determinative importance to this case because the Illinois Public Labor Relations Act (Act) excludes managerial employees from the class of employees who are entitled to engage in collective bargaining. See 5 ILCS 315/3(n), 6(a) (West 2008).

What is a "managerial employee"? Section 3(j) of the Act provides the following definition: "an individual who is engaged predominantly in executive and management functions and is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2008). We can break this definition down into two elements: (1) engaged predominantly in executive and management functions and (2) charged with the responsibility of directing the effectuation of management policies and practices.

The Act does not define "executive and management functions," but the Board has explained that these functions amount to running an agency or department, such as by establishing policies and procedures, preparing the budget, or otherwise assuring that the agency or department operates effectively. American Federation of State, County & Municipal Employees, Council 31, 25 Pub. Employee Rep. (Ill.) par. 68, No. S-RC-07-174, at 277 (Illinois Labor Board, State Panel, May 12, 2009) (2009 PERI (LRP) LEXIS 61, at *6) (hereinafter 25 Pub. Employee Rep. (Ill.) par. 68); City of Freeport, 2 Pub. Employee Rep. (Ill.) par. 2052, No. S-RC-181, at 381 (Illinois State Labor Relations Board, November 5, 1986) (1986 PERI (LRP) LEXIS 591). Unless a statute specially defines a term, we are to give the term its plain and ordinary meaning (Wahlman v. C. Becker Milling Co., 279 Ill. 612, 622, 117 N.E. 140, 144 (1917); Gekas v. Williamson, 393 Ill. App. 3d 573, 579, 912

- 11 -

N.E.2d 347, 353 (2009)), and the Board's definition of "executive and management functions" accords with the plain and ordinary meaning of "executive" and "management." An "executive" is someone who "exercises administrative or managerial control" (Merriam-Webster's Collegiate Dictionary 437 (11th ed. 2003)), and "management" is "the collective body of those who manage or direct an enterprise" (Merriam-Webster's Collegiate Dictionary 754 (11th ed. 2003)). In other words, executives or managers run the organization. Formulating policies and procedures and preparing the budget are among the types of things that executives or managers typically would have the authority to do.

Whereas the first part of the statutory definition of a "managerial employee" describes the nature of the work to which the individual devotes most of his or her time, i.e., the performance of "executive or management functions," that is, running the agency, the second part of the definition emphasizes that a managerial employee's authority extends beyond the realm of theorizing and into the realm of practice. See 5 ILCS 315/3(j) (West 2008). A managerial employee not only has the authority to make policy but also bears the responsibility of making that policy happen. Such a person "is charged with the responsibility of directing the effectuation of management policies and practices." 5 ILCS 315/3(j) (West 2008). We have held that an individual directs the effectuation of management policies and practices if he or she "oversees or coordinates policy implementation through development of means and methods of achieving policy objectives, determines the extent to which the objectives will be achieved, and is empowered with a substantial amount of discretion to determine how policies will be effected." Department of Central Management Services v. Illinois State Labor Relations Board, 278 Ill. App. 3d 79, 87, 662 N.E.2d 131, 137 (1996) (CMS appeals grant of AFSCME's representation petition

for corrections leisure activities specialist IV and certification, contending the employees were supervisors and managerial within the meaning of the Act).

In other words, managerial employees do not merely recommend policies or give advice that someone higher up is equally apt to take or leave; rather, they actually direct the governmental enterprise in a hands-on way. "If the employee's role is advisory and subordinate, the employee is not a managerial employee because it is the final responsibility and independent authority to establish and effectuate policy that determines management status." Department of Central Management Services, 278 Ill. App. 3d at 87, 662 N.E.2d at 136-37.

Our remark about advisory employees' not being managerial employees is subject, however, to an important qualification, which the Board overlooks in its brief: an advisory employee who makes "'effective recommendations'" can be managerial. Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board, 178 Ill. 2d 333, 339-40, 687 N.E.2d 795, 798 (1997), quoting National Labor Relations Board v. Yeshiva University, 444 U.S. 672, 683 n.17, 63 L. Ed. 2d 115, 126 n.17, 100 S. Ct. 856, 863 n.17 (1980). What are "effective recommendations"? In a purely linguistic sense, they are, quite simply, recommendations that are followed. To be "effective" means to "produc[e] a decided, decisive, or desired effect" (Merriam-Webster's Collegiate Dictionary 397 (11th ed. 2003). Among the synonyms of "effective" are "powerful" and "influential." Bartlett's Roget's Thesaurus 412.10 (1996). Hence, recommendations are "effective" if they produce the effect they seek, that is, if they are implemented.

In Yeshiva, the Supreme Court seemed to understand the term "effective recommendations" in this ordinary sense. In that case, the faculty members of a university,

whom the union had petitioned to represent, not only controlled the academic policy of the university, but the central administration followed their advice on personnel matters almost all the time. Yeshiva, 444 U.S. at 677, 63 L. Ed. 2d at 122, 100 S. Ct. at 859. The union argued that the faculty was "merely advisory," but the Supreme Court took note of the effectiveness, the decisive influence, of the faculty's advice. "[T]he fact that the administration holds a rarely exercised veto power does not diminish the faculty's effective power in policymaking and implementation," the Supreme Court said. Yeshiva, 444 U.S. at 683 n.17, 63 L. Ed. 2d at 126 n.17, 100 S. Ct. at 863 n.17. The recommendations of the faculty members "effectively control[led] or implement[ed] employer policy." Yeshiva, 444 U.S. at 683, 63 L. Ed. 2d at 126, 100 S. Ct. at 862. In addition to having absolute control over academic policy (Yeshiva, 444 U.S. at 686, 63 L. Ed. 2d at 128, 100 S. Ct. at 864), the faculty members had effective control over personnel policy, through their recommendations, which the administration almost always followed (Yeshiva, 444 U.S. at 677, 677 n.5, 63 L. Ed. 2d at 122, 122 n.5, 100 S. Ct. at 859, 859 n.5). Consequently, the Supreme Court agreed with the court of appeals that the faculty members were "'managerial employees'" (Yeshiva, 444 U.S. at 682, 63 L. Ed. 2d at 125, 100 S. Ct. at 862), a term which case law and, ultimately, the National Labor Relations Board had defined as "those who ' "formulate and effectuate management policies by expressing and making operative the decisions of their employer" ' " (Yeshiva, 444 U.S. at 682, 63 L. Ed. 2d at 125-26, 100 S. Ct. at 862, quoting National Labor Relations Board v. Bell Aerospace Co., Division of Textron, Inc., 416 U.S. 267, 288, 40 L. Ed. 2d 134, 150, 94 S. Ct. 1757, 1768 (1974), quoting In re Palace Laundry Dry Cleaning Corp., 75 N.L.R.B. 320, 323 n.4 (1947)).

According to our own supreme court, the definition of a "managerial

employee" in section 3(j) of the Act (5 ILCS 315/3(j) (West 2008)) is "very similar" to the definition of a "managerial employee" in Yeshiva. Yeshiva, 444 U.S. at 683, 63 L. Ed. 2d at 125, 100 S. Ct. at 862; Chief Judge, 178 Ill. 2d at 339, 697 N.E.2d at 797. Further, our supreme court has made it clear that the concept of "'effective recommendations,'" which the Supreme Court of the United States held to be applicable to the managerial exclusion in Yeshiva, applies with equal force to the managerial exclusion under the Illinois statute. Chief Judge, 178 Ill. 2d at 339-40, 687 N.E.2d at 798. The Board has incorporated "effective recommendations" into its interpretation of the term "managerial employee."

The problem, however, is that the Board has qualified the concept of "effective recommendations," and really, there should be no qualification, because, under Yeshiva, the concept means what it says. The Board has held that in order for recommendations to be effective, it is not enough that they are accepted almost all the time: the Board has added the qualification that they must be accepted with little or no "independent review" or "investigation." Metropolitan Alliance of Police, Sergeants Chapter No. 534, 26 Pub. Employee Rep. (Ill.) par. 7, No. S-RC-09-057, at 22 (Illinois Labor Board, State Panel, February 1, 2010) (2010 PERI (LRP) LEXIS 7, at *8); International Union of Operation Engineers, Local #7, 4 Pub. Employee Rep. (Ill.) par. 2041, No. S-RC-88-56, at 299 (Illinois State Labor Relations Board, October 13, 1988) (1988 PERI (LRP) LEXIS 574). The test, though, is not the presence or absence of review. Any recommendation implies a review of some sort, if only of the recommendation. See City of Peru v. Illinois State Labor Relations Board, 167 Ill. App. 3d 284, 290, 521 N.E.2d 108, 113 (1988). Rather, the test is the effectiveness, power, or influence of the recommendations. Granted, acceptance of recommendations after only a cursory review could suggest a heavy reliance on the

recommendations; but thorough reviews would not necessarily negate a reliance on the recommendations. Theoretically, a superior could always perform an independent investigation of the facts and yet almost invariably defer to the subordinate's judgment as to what to do about those facts. Or, alternatively, a superior could always perform an independent review of the recommendations, both in their facts and in their evaluation of the facts, and although the superior almost always approves the recommendations, it is not because of the influence of the recommendations themselves, but rather it is because the recommendations are almost always correct. All this is a way of saying that the criterion, properly speaking, is the effectiveness of the recommendations. The extent of review could be an indication of the effectiveness of the recommendations, but review is not the litmus test. Rather, the litmus test is the influence of the recommendations, i.e., whether they almost always persuade the superiors. Yeshiva, 444 U.S. at 677, 63 L. Ed. 2d at 122, 100 S. Ct. at 859-60.

E. The Possible Managerial Status of the Eight ALJs

1. The Effectiveness of Their Recommendations

After this introduction to the managerial exclusion, we now turn our attention to the eight ALJ positions, as they are described in CMS's documentary submissions to the Board, to determine whether the Board committed clear error by finding no "unresolved issue" as the ALJs' managerial status (80 Ill. Adm. Code §1210.100(b)(7)(C), as amended by 28 Ill. Reg. 4172, 4192 (eff. February 19, 2004)) or by finding that CMS, by an insufficiency in its documentary submissions, had forfeited its defense that the ALJs were managerial employees (see 80 Ill. Adm. Code §1210.100(b)(6), as amended by 28 Ill. Reg. 4172, 4191-92 (eff. February 19, 2004)). See City of Chicago, 396 Ill. App. 3d at 72, 918

- 16 -

N.E.2d at 1113-14 ("this court reviews the Board's finding that a hearing was not required under the clearly erroneous standard").

One way of approaching this question is to compare the job functions of these ALJs to the overall mission of the Illinois Commerce Commission. If the responsibilities of a job title encompass the agency's entire mission, or a major component of its mission, one might reasonably argue that by fulfilling those responsibilities, an employee helps to run the agency. In other words, if the ALJs are, as a practical matter, the whole game when it comes to utility regulation-- just as the faculty members in Yeshiva were the whole game when it came to academic policy--they arguably are managerial employees. In Yeshiva, 444 U.S. at 686, 63 L. Ed. 2d at 127-28, 100 S. Ct. at 864, the faculty had absolute authority over academic matters, such as what courses would be offered, when they would be scheduled, and to whom they would be taught. The faculty also determined the teaching methods, grading policies, and graduation standards. Yeshiva, 444 U.S. at 686, 63 L. Ed. 2d at 128, 100 S. Ct. at 864. The subject matter of the faculty's authority, or the subject matter on which the faculty made effective recommendations, pretty much described what the university was all about. The Supreme Court remarked: "When one considers the function of a university, it is difficult to imagine decisions more managerial than these." Yeshiva, 444 U.S. at 686, 63 L. Ed. 2d at 128, 100 S. Ct. at 864.

Likewise, when we consider the function of the Commission, as set forth in sections 4-101 and 4-201 of the Public Utilities Act (220 ILCS 5/4-101, 4-201 (West 2008)), it appears to be the function, broadly stated, of the ALJs--or at least they appear to have prominent roles in the fulfillment of that function. According to section 4-101, "[t]he Commerce Commission shall have general supervision of all public utilities" (220 ILCS 5/4-

101 (West 2008)), and section 4-201 makes it "the duty of the Commission to see that the provisions of the Constitution and statutes of this State affecting public utilities *** are enforced and obeyed" (220 ILCS 5/4-201 (West 2008)). That also is what the ALJs do, effectively. According to CMS's position statement, the ALJs participate in the enforcement of laws applicable to public utilities by holding quasi-judicial hearings. "The major part of their responsibilities is to hear petitions brought by public utilities as to rate increases; citations against them regarding, for example, transmission issues; to hear disputes between utilities such as telephone companies; and to hear consumer complaints." The ALJs also conduct hearings on proposed rules. The end result of these hearings is a recommended order that the ALJ presents to the Commission. In its response to the rule to show cause, CMS says that the Commission rarely makes any substantive modification of these recommended orders and that "outright reversals are even rarer." According to "a conservative estimate by the Chief Administrative Law Judge," the Commission adopts the ALJs' recommendations 95% of the time.

It appears, then, that this procedure by which the ALJs hold hearings and issue recommended orders, which the Commission adopts almost all the time, is the primary means, if not the exclusive means, by which the Commission fulfills its statutory mandate of regulating public utilities. CMS made, at minimum, a plausible claim when it wrote to the Board: "[T]hese [ALJs] are the employees the Employer primarily relies upon to effectively carry out the Commission's regulatory duties." If the members of the Commission make and implement policy through the issuance of orders, and if their orders are almost always the ALJs' recommended orders (with the title of the document changed and the chairman's signature added at the end), a good argument could be made that the

ALJs make effective recommendations on major policy and the implementation of such policy. See Yeshiva, 444 U.S. at 683 n.17, 63 L. Ed. 2d at 126 n.17, 100 S. Ct. at 863 n.17.

If an ostensibly advisory employee exercises managerial authority through his or her recommendations on major policy issues, which the superiors almost always accept, we will look beyond the formal structure of the employee's participation in the enterprise, i.e., the making of recommendations, and take account of the power that the employee actually wields. Functionally, if there is not much difference between the employee's recommendation and a managerial order, we will treat them as the same for purposes of the managerial exclusion. See Chief Judge, 178 Ill. 2d at 339-40, 687 N.E.2d at 798.

2. Formulating, or Directing the Effectuation of, Policy

The union contends that although the eight ALJs are "involved in carrying out" policy, they neither formulate policy nor direct the effectuation of policy. Again, to be a managerial employee, an individual must do two things. First, the individual must be "engaged predominantly in executive and management functions." 5 ILCS 315/3(j) (West 2008). These functions "relate to running a department and include such activities as formulating department policy, preparing the budget, and assuring efficient and effective operations of the department." Village of Elk Grove Village v. Illinois State Labor Relations Board, 245 Ill. App. 3d 109, 121-22, 613 N.E.2d 311, 320 (1993). Second, the employee must direct the effectuation of management policies and practices. 5 ILCS 315/3(j) (West 2008); Elk Grove Village, 245 Ill. App. 3d at 122, 613 N.E.2d at 320.

As for the first element, it is not absolutely essential that a managerial employee formulate policy. Formulating policy is merely one example of running an agency. If formulating policy were the sine qua non of the managerial exclusion, one could

envision a situation in which the highest-ranking official of an agency, the director, would not be a managerial employee. Theoretically, a director could consider the existing regulations and procedures of an agency to be perfectly adequate, and the director might see no need to create any new policies. Yet it would be absurd to deny that such a director is a managerial employee, because, as the highest-ranking employee, this director has the responsibility of running the department.

Running the department might or might not entail the creation of new policies, but it will always entail "directing the effectuation" of existing policies. 5 ILCS 315/3(j) (West 2008). By their recommended orders, which the Commission almost always accepts without modification, the ALJs appear to be directing the effectuation of the State's policies regarding public utilities. For example, exhibit A of CMS's response to the order to show cause is an order of the Commission, which we are to understand was drafted by one of the ALJs in question, and this order, adopted by the Commission on January 24, 2006, appears to direct the effectuation of policies set forth in section 1-102 of the Public Utilities Act (220 ILCS 5/1-102(a)(iv) (West 2006)) and section 16-112(a) of the Electric Service Customer Choice and Rate Relief Law of 1997 (1997 Law) (220 ILCS 5/16-112(a) (West 2006)), among other Illinois statutes. In re Commonwealth Edison Co., No. 05-0159 (January 24, 2006) (unpublished Illinois Commerce Commission order). In exhibit A, written by an ALJ, the Commission approves a "competitive auction process," thereby directing the effectuation of the policy in section 1-102 that "tariff rates for the sale of various public utility services *** accurately reflect the cost of delivering those services" (220 ILCS 5/1-102(a)(iv) (West 2006)) as well as the policy in section 16-112(a) of determining the market value of electric power and energy. Pursuant to the 1997 Law,

Commonwealth Edison had divested itself of its power-generating facilities, choosing to obtain all of its power supply from the wholesale market. Consequently, Commonwealth Edison's cost of delivering electricity to its customers would henceforth be the market price that Commonwealth Edison paid for the electricity. The goal was to devise an auction process, as well as a procedure for reviewing the auction, that would effectuate the statutory policies of protecting consumers while giving Commonwealth Edison just and reasonable compensation for the electric service it provided. The "competitive auction procurement mechanism" described in the Commission's order, exhibit A (which, presumably, is the ALJ's recommended order verbatim), is calculated to direct the effectuation of those policies.

F. The Question of Managerial Status as a Matter of Law

Simultaneously with this opinion, we are issuing an opinion in Department of Central Management Services/Human Rights Comm'n v. Illinois Labor Relations Board, State Panel, No. 4-09-0721 (December 28, 2010), _____ Ill. App. 3d _____, _____ N.E.2d _____ (CMS/HRC), in which we conclude that ALJs of the Illinois Human Rights Commission are managerial employees as a matter of law (CMS/HRC, slip op. at 11, _____ Ill. App. 3d at _____, _____ N.E.2d at _____). In that opinion, we compare the ALJs of the Human Rights Commission to the assistant State's Attorneys in Cook County State's Attorney v. Illinois Local Labor Relations Board, 166 Ill. 2d 296, 652 N.E.2d 301 (1995), and the assistant public defenders in Chief Judge. CMS/HRC, slip op. at 11, _____ Ill. App. 3d at _____, _____ N.E.2d at _____. The supreme court held, in Cook County State's Attorney, 166 Ill. 2d at 303, 652 N.E.2d at 304, that assistant State's Attorneys were managerial employees as a matter of law because they were "surrogates" of State's Attorneys. Likewise,

in <u>Chief Judge</u>, 178 Ill. 2d at 344, 687 N.E.2d at 800, the supreme court held that assistant public defenders were managerial employees as a matter of law because they were "surrogates" of public defenders. In <u>CMS/HRC</u>, slip op. at 11, _____ Ill. App. 3d at _____, _____ N.E.2d at _____, we conclude that "the ALJs' actions are closely identified with those of the [Human Rights] Commission" in the way that the actions of assistant State's Attorneys and assistant public defenders are closely identified with those of their superiors, of which they are surrogates.

Naturally, then, the question might be asked, Why do we not draw an analogous conclusion in the present case: why do we not conclude that the ALJs in this case are so closely identified with the members of the Illinois Commerce Commission as to be their surrogates and therefore managerial employees as a matter of law? The reason is a difference in administrative procedures from one agency to the other, specifically the procedures relating to "exceptions."

"Exceptions" are a party's written arguments against the recommended order that an ALJ issues after an evidentiary hearing or administrative trial. It appears that under the statutory law and administrative rules, the lack of exceptions does not have the same legal consequence before the Commerce Commission as before the Human Rights Commission. In <u>CMS/HRC</u>, slip op. at 10-11, _____ Ill. App. 3d at _____, _____ N.E.2d at _____, we note that under section 8A-103(A) of the Illinois Human Rights Act (775 ILCS 5/8A-103(a) (West 2008)), if no exceptions are filed to the ALJ's recommended order, the recommended order automatically becomes the final order of the Human Rights Commission as if the members of the Human Rights Commission themselves issued the order. The lack of exceptions deprives the Human Rights Commission of any power to

- 22 -

gainsay the recommended decision of its ALJ. Section 8A-103(A) says: "If no exceptions are filed, the recommended order shall become the order of the [Human Rights] Commission without further review." 775 ILCS 5/8A-103(A) (West 2008).

We are unaware, however, of any comparable procedural provision in the Public Utilities Act (220 ILCS 5/1-101 through 22-503 (West 2008)) or implementing regulations. Although the procedure before the Commerce Commission appears to be somewhat comparable to that before the Human Rights Commission in that the ALJ issues a recommended order (220 ILCS 5/10-111 (West 2008)), to which the parties may file exceptions (83 Ill. Adm. Code §§200.820(a)(1), 200.830, as amended by 20 Ill. Reg. 10607, 10627-28, eff. August 15, 1996), we are unaware of any statute or rule that automatically makes the ALJ's recommended order the final order of the Commerce Commission in the absence of exceptions. Instead, after receiving the ALJ's recommended order, the Commerce Commission is supposed to make its own decision, even if it receives no exceptions. "Following receipt of the proposed order of the Hearing Examiner and any briefs of the parties, and following oral argument, if any, the Commission shall make its decision and shall serve a copy of its order upon all parties in the manner provided by Section 10-112 of the Public Utilities Act [(220 ILCS 5/10-112 (West 2008))]." 83 Ill. Adm. Code §200.860 (Conway Greene CD-ROM June 2000). The term "briefs," in this context, includes "briefs on exceptions" (83 Ill. Adm. Code §200.830, as amended by 20 Ill. Reg. 10607, 10627-28, eff. August 15, 1996), and the phrase "any briefs" contemplates the theoretical possibility that there might be no briefs and no exceptions--in which event, the Commerce Commission will issue its own decision anyway.

Hence, unlike an ALJ of the Human Rights Commission, an ALJ of the

Commerce Commission does not become a surrogate, i.e., a substitute or alter ego, of the commission members whenever there is an absence of exceptions. Exceptions or no exceptions, the members of the Commerce Commission retain the power and duty to issue their own order, their own decision, after receipt of the ALJ's recommended order. Under no circumstances is an ALJ of the Commerce Commission clothed with the ultimate power of the commission members; therefore, the ALJ is not a managerial employee as a matter of law within the meaning of Chief Judge and Cook County State's Attorney. Cf. Cook County State's Attorney, 166 Ill. 2d at 303, 652 N.E.2d at 304, quoting People v. Nahas, 9 Ill. App. 3d 570, 575, 292 N.E.2d 466, 470 (1973) (" 'An Assistant State's Attorney is generally clothed with all the powers and privileges of the State's Attorney ***' ").

III. CONCLUSION

For the foregoing reasons, we reverse the Board's decision in case Nos. S-RC-10-034 and S-RC-10-036 and remand those cases for further administrative proceedings on the question of whether the eight ALJs in question are managerial employees.

Reversed and remanded.

STEIGMANN and McCULLOUGH, JJ., concur.