# Illinois Official Reports

## Appellate Court

---

### *Clerk of the Circuit Court v. Illinois Labor Relations Board, State Panel*,
### 2016 IL App (2d) 150849

---

| | |
|---|---|
| Appellate Court Caption | THE CLERK OF THE CIRCUIT COURT OF LAKE COUNTY, Petitioner, v. THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL; JOHN HARTNETT, as Chairman and Member of the State Panel; JOHN SAMOLIS, KEITH SNYDER, and AL WASHINGTON, as Members of the State Panel; and THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, Respondents. |
| District & No. | Second District<br>Docket No. 2-15-0849 |
| Filed | August 15, 2016 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-RC-15-049. |
| Judgment | Confirmed. |
| Counsel on Appeal | Jack J. Murphy, A. Lynn Himes, and Anthony Scariano III, all of Scariano, Himes & Petrarca, Chtrd., of Chicago, for petitioner.<br><br>Melissa J. Auerbach, of Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, of Chicago, for respondent American Federation of State, County and Municipal Employees.<br><br>Lisa Madigan, Attorney General, of Chicago (Ann C. Maskaleris and Sharon A. Purcell, Assistant Attorneys General, of counsel), for other respondents. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1  Petitioner, the Clerk of the Circuit Court of Lake County (Clerk), appeals the final decision and order of respondent the Illinois Labor Relations Board, State Panel (Board), certifying respondent the American Federation of State, County and Municipal Employees, Council 31 (Union), as the exclusive representative of a bargaining unit composed of certain of the Clerk's employees. On appeal, the Clerk challenges the propriety of the Board's decision, contending that it was not properly adopted. The Clerk also argues that the Board misapprehended the pleading requirements to challenge a majority-interest petition and that the Clerk produced sufficient evidence of fraud or coercion to warrant an evidentiary hearing. We confirm the Board's decision.

¶ 2                          I. BACKGROUND

¶ 3  The record reveals, pertinently, that on January 20, 2015, the Union submitted a majority-interest petition pursuant to section 9(a-5) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/9(a-5) (West 2014)), seeking to represent a bargaining unit composed of certain of the Clerk's employees. On January 21, 2015, the Clerk was notified of the petition and directed to respond if it so chose. Particularly, the Clerk was notified that, if it believed that the Union had used fraud or coercion to obtain the signatures necessary to demonstrate majority support, it was required to present clear and convincing evidence of the fraud or coercion in its response to the petition.

¶ 4  On February 6, 2015, the Clerk timely filed its response to the Union's majority-interest petition. Relevantly, the Clerk alleged that the Union had used fraudulent information and had threatened employees in an effort to coerce them into signing dues-deduction cards. The Clerk included two affidavits in its response.

¶ 5  Jeanne Polydoris, the chief deputy clerk, submitted one of the affidavits attached to the Clerk's response. Polydoris was not eligible to become a member of the proposed bargaining unit. She averred that four eligible employees of the Clerk complained to her about the Union's representatives. Three of the employees requested that their identities be kept confidential because they feared repercussions from the Union or from their coworkers.

¶ 6  According to Polydoris, one employee was visited by different Union representatives between 7 and 8 p.m., twice a week for an unspecified number of weeks. The employee "believed [the representatives] were watching her house and tracking her schedule." Polydoris reported that the employee was a single mother and that she was so frightened by their conduct that she filed a police report.

¶ 7  Polydoris averred that a second employee informed her that a Union representative visited her home. The second employee maintained that the Union representative was condescending and insulted her intelligence. The second employee reported to Polydoris that the representative claimed that union membership would result in better pay, better pay increases, and better vacation benefits. Additionally, the employee stated that the representative claimed

that future pay raises under a collective bargaining agreement would be sufficient to cover her union dues. The second employee told Polydoris that the representative used insults and peer pressure to attempt to coerce her into joining the Union.

¶ 8    Polydoris noted that a third employee stated that a Union representative "came to her home and told her that joining the union would be free and there would not be any dues." The employee was concerned about how the representative knew her home address.

¶ 9    Veronica Ventura, an employee of the Clerk, submitted the second affidavit attached to the Clerk's response to the Union's petition. She averred that a coworker approached her about joining the Union. The next day, Ventura received a text message from the coworker, who was not scheduled to work that day, stating that the coworker would meet Ventura outside the office after working hours. Ventura averred that she "found [the coworker's] text threatening and it made [Ventura] feel uncomfortable." After work, the coworker was waiting for Ventura. Ventura informed the coworker that she would not sign a dues-deduction card.

¶ 10   Ventura further averred:

"That evening, around 8:00 pm [*sic*], [a Union] Representative came to my house to pressure me into signing the card. I had already told [the coworker] that I was not interested and this conduct made me feel even more threatened. I escorted the [Union] Representative out of my home and told him that I was not interested and that I had already told [the coworker] that. As he was leaving, he said he was going to come back on Sunday. I found this threatening and I was concerned about how the [Union] Representative so reported it [*sic*] to my supervisor, *** upon returning to work the following workweek."

¶ 11   Ventura averred that the coworker continued to press Ventura to join the nascent bargaining unit, both by text message and face-to-face. Ventura once again told the coworker that she "did not appreciate [the coworker's] text or the [Union] representative coming to [her] home." Ventura maintained that she "felt threatened by [her coworker] and even more threatened by the [Union] Representative coming to [her] home."

¶ 12   The matter was then assigned to an administrative law judge (ALJ) for further proceedings. On March 10, 2015, the ALJ issued an order to show cause on two of the Clerk's objections. The ALJ explained:

"In its last objection, the [Clerk] argues that [the Union] obtained support for its campaign through the use of fraud and coercion. Section 9(a-5) of the Act [(5 ILCS 315/9(a-5) (West 2014))] states that if a 'party provides to the Board *** clear and convincing evidence that the dues deduction authorizations, and other evidence upon which the Board would otherwise rely to ascertain the employees' choice of representative, are fraudulent or were obtained through coercion, the Board shall promptly thereafter conduct an election.' The [Clerk] states that [the Union] obtained employees' personal contact information to contact employees at home. It also states that [the Union] provided fraudulent information to employees and threatened them into signing representation cards. In support of its allegations, the [Clerk] provided two affidavits which describe [the Union's] conduct in this matter. However, I do not find that the affidavits are clear and convincing evidence of fraud or coercion as one affidavit is based on hearsay and the other does not describe objectively coercive conduct."

The ALJ then ordered the Clerk to "[d]emonstrate through specific evidence, case law, and/or legal argument why the [Clerk's] affidavits constitute clear and convincing evidence of fraud or coercion, and/or provide clear and convincing evidence that [the Union] attempted to or actually did obtain support for its campaign through fraud or coercion."

¶ 13 The Clerk timely responded to the ALJ's order to show cause. In its response, the Clerk attached two additional affidavits, apparently from two of the unidentified employees referenced in Polydoris's affidavit.

¶ 14 Jeanette Halle, an employee of the Clerk, averred that, on a Saturday afternoon, a Union representative came to her home but was not allowed past her building's security door. The representative kept Halle in conversation for 20 to 30 minutes. Halle averred that the representative was condescending and insulted her intelligence. The representative tried to get Halle to agree with complaints that other employees had purportedly made. The representative claimed to Halle that "everyone" was unhappy in working for the Clerk. Halle averred that, every time she made positive comments, "he tried to convince me otherwise." According to Halle, the representative "claimed that joining the union would result in better salaries, better raises and better vacation benefits." The representative also claimed that, after the Union had bargained with the Clerk, Halle's raise would cover the monthly dues to be paid to the Union. Finally, Halle concluded that the representative "appeared to be attempting to use peer pressure and insults to induce [her] into joining the union."

¶ 15 Sandra Lucio, also an employee of the Clerk, averred that two different Union representatives "kept coming to [her] house twice a week" between 7 and 8 p.m. Lucio would not open the door for the representatives. She further reported that "[t]hey were parking away from [her] house and [she] could not see their car, which made [her] even more uncomfortable." Lucio, who was a single mother working two jobs and whose child was frequently home alone in the evenings, became frightened by the representatives' conduct, so she filed a police report. Lucio further recounted that, "[a]fter [she] filed the report, [she] was getting [her] garbage cans from the street when [a Union] representative approached [her]. They [*sic*] appeared to know [her] schedule and [she] was concerned that they [*sic*] were watching [her] house and tracking [her schedule]." Lucio averred that she was upset that the Union representatives had her personal information and her home address. Lucio also believed that, if her coworkers became aware that she had reported the representatives' conduct, her coworkers would "make [her] life miserable every day at work."

¶ 16 Notably, neither Halle nor Lucio indicated that she had signed a dues-deduction card, despite the fraudulent or coercive blandishments of the Union representatives. Likewise, Ventura similarly did not indicate that she had signed a dues-deduction card, despite her complaints of being pressured to do so.

¶ 17 On April 28, 2015, the ALJ issued her recommended decision and order. Pertinent to our decision, the ALJ analyzed the Clerk's fraud-and-coercion argument:

> "The [Clerk] argues that the Union used fraud and coercion to obtain support for its organizing campaign. The Act states that the Board will certify a union as the exclusive representative of a unit of employees if the union 'demonstrates a showing of majority interest.' 5 ILCS 315/9(a-5) [(West 2014)]. However, if an employer provides the Board with 'clear and convincing evidence that the dues deduction authorizations, and other evidence upon which the Board would otherwise rely to ascertain the employees' choice of representative, are fraudulent or were obtained through coercion, the Board

- 4 -

shall promptly thereafter conduct an election.' *Id.* The Board's rules further specify that:

> '[a]ll employers served with a majority interest petition shall file a written response to the petition within 14 days after service of the petition. The response filed shall set forth the party's position with respect to the matters asserted in the petition, including, but not limited to, the appropriateness of the bargaining unit and, to the extent known, whether any employees sought by petitioner to be included should be excluded from the unit. *The employer must also provide at this time clear and convincing evidence of any alleged fraud or coercion in obtaining majority support.*' 80 Ill. Adm. Code § 1210.100(b)(3) [(2004)] (emphasis added [by the ALJ]).

If the employer provides 'evidence demonstrating a material issue of fact or law relating to fraud or coercion,' the board will conduct a hearing. [80 Ill. Adm. Code] 1210.100(b)(5)(B) [(2004)]. However, if the employer fails to provide sufficient evidence of fraud or coercion, 'the Board will certify the union as the unit's exclusive representative if it is determined to have majority support.' [80 Ill. Adm. Code] 1210.100(b)(5)(A) [(2004)].

In coercion cases, the Board applies 'an objective standard to determine whether, from the standpoint of the employee, the challenged conduct would reasonably have a coercive effect.' *Vill. of Barrington Hills (Police Dep't)*, 26 PERI ¶ 59 (IL LRB-SP 2010) [*sic*]. For example, in *Vill. of Barrington Hills (Police Dep't)* [*sic*], the Board agreed with the Executive Director's decision to apply an objective standard, as well as with his determination that the challenged conduct would not have reasonably coerced employees. *Id.* In support of its argument, the village submitted two affidavits from village supervisors. *Id.* The supervisors described their conversations with several employees regarding the union's conduct. *Id.* First, the Board found that the village's evidence did not establish that employees had been threatened or that the employees' fears of being retaliated against were reasonable. *Id.* More specifically, the village had not presented 'evidence of actual retaliation, for example, or even of threatened retaliation.' *Id.* The Board also noted that the affidavits constituted hearsay evidence and '[t]he statutory standard call[ed] for "clear and convincing" evidence of fraud or coercion.' *Id.* As such, the Board agreed 'that the evidence the [v]illage presented here falls far short of meeting the "clear and convincing" statutory standard.' *Id.*

In this case, the [Clerk] argues that the Union used fraud and coercion during its organizing drive. With regard to its fraud argument, the [Clerk] first contends that the Union provided fraudulent information to employees. In one instance, a Union representative told an employee that she would receive better benefits under Union representation and that her dues would be covered by her first contract raise. According to another employee, a representative said she would not have to pay dues. As an initial matter, I note that the representative's statement that an employee would not have to pay dues is hearsay from an unidentified source and not generally considered clear and convincing evidence. Regardless, I do not find this evidence sufficient to conclude the Union gave employees fraudulent information. While I may find the Union's statements odd, I cannot say they are necessarily false. The Act does not require bargaining unit members to pay dues, and the [Clerk] has not supplied any other evidence on the matter. Further, it is permissible under the Act for a union to promote

- 5 -

itself to prospective members. See *PACE Heritage Division*, 22 PERI ¶ 59 (IL LRB-SP 2006) [*sic*]; *Midland Nat'l Life Ins. Co.*, 263 NLRB 127 (1982) [*sic*]. As such, I find the [Clerk] has not established that the Union provided fraudulent information to employees.

The [Clerk] also argues that the Union used pro-Union employees to gain access to employees' home addresses. Under the [Clerk's] policies, employees' personal contact information is kept confidential. Since the Union had the employees' addresses, the [Clerk] suggests the Union must have obtained the information in violation of the [Clerk's] policies. This argument is not supported by the evidence. While it is clear that the Union had at least some of the employees' home addresses, it is not a foregone conclusion that pro-Union employees violated the [Clerk's] policies to retrieve them. There are a variety of ways to learn where someone lives, including the internet, the phonebook, or even word of mouth. Thus, the [Clerk's] suggestion that the Union must have used surreptitious means to access employees' addresses is not supported by the evidence presented.

The [Clerk's] primary argument is that the Union intimidated, threatened, and coerced employees into supporting its organizing drive. However, the evidence does not establish that the Union's conduct was objectively coercive. For example, one employee felt threatened by her pro-Union coworker's text messages. However, the coworker did not threaten the employee or suggest that the employee would be retaliated against for refusing to sign a card. Consequently, I cannot find the messages objectively coercive.

Additionally, I do not find the Union's home visits to be coercive. The [Clerk] argues that 'the representatives stalked employees by lying in wait outside of employees' homes.' Of the three employees visited by the Union, two employees stated they felt threatened by the Union's conduct. One employee said she was so frightened by the Union's conduct that she filed a police report. She also believed the Union was tracking her schedule. The other employee stated she felt threatened when the representative told her that he would come back to her home in a few days. However, the evidence does not establish that their fears were reasonable. There is no evidence that the Union actually threatened these employees or used other intimidation tactics to force the employees to sign cards. Thus, under the objective standard, I do not find this conduct would reasonably coerce employees. As to the third employee, she stated that the Union representative she spoke to was condescending and insulting. Although patronizing and rude behavior[s] are not ideal strategies to use during an organizing campaign, in the absence of threats or other forms of intimidation, these tactics are not coercive.

Finally, there is no evidence demonstrating that the employees' fears of being retaliated against by their coworkers were justified. Again, there is no evidence that the coworkers' [*sic*] threatened to retaliate against the employees if they did not sign cards. The employees' assertions, on their own, are not enough to establish coercion. The [Clerk] was required to provide evidence that the employees' fears were reasonable.

In sum, the [Clerk] has failed to establish that the Union used fraud or coercion to gain support for its organizing campaign. Accordingly, I find that this objection is without merit and does not raise an issue for hearing."

¶ 18     The ALJ held, in a section labeled "Conclusions of Law," that the Clerk "has not demonstrated an issue of law or fact exists regarding fraud or coercion." The ALJ then recommended that the Board certify the Union as the exclusive representative of the employees described in the Union's petition, and the ALJ recommended that, as the Clerk proposed, the positions of ombudsman and principal court clerk be excluded from the bargaining unit. The ALJ also noted that the parties were allowed to file exceptions to the recommended decision and order and outlined the time frame and procedure for doing so.

¶ 19     On May 14, 2015, the Clerk timely filed its exceptions to the ALJ's recommended decision and order. The Clerk again raised the arguments it had presented to the ALJ, and it contended that the evidence about fraud and coercion was sufficient to require a hearing. The Union filed a timely response to the Clerk's exceptions.

¶ 20     On July 14, 2015, the Board issued its decision and order. The Board's order stated:

"On April 28, 2015, [the ALJ] issued a Recommended Decision and Order (RDO) recommending that the Board certify [the Union] as the exclusive representative of a unit of certain full- and part-time non-professional employees employed by the [Clerk]. In so holding, she rejected the [Clerk's] contention that it had raised issues of fact for hearing on the allegation that the Union had obtained its showing of interest through fraud or coercion.

The [Clerk] filed timely exceptions to the ALJ's RDO pursuant to Section 1200.135 of the Illinois Labor Relations Board's Rules and Regulations. 80 Ill. Adm. Code Parts 1200 through 1240. The exceptions focus solely on the ALJ's finding that the [Clerk] did not present clear and convincing evidence that would raise issues of fact for hearing on [the Union's] alleged fraud or coercion in obtaining majority support. [The Union] filed a response.

The ALJ's decision will stand as a non-precedential ruling because the Board could not reach a majority decision on whether to affirm or reverse it. Member Washington was absent and did not vote. Chairman Hartnett voted to reverse the ALJ's decision on the basis that a hearing would shed additional light on the circumstances referenced in the [Clerk's] objections and supporting affidavits. Member Snyder voted to reverse the ALJ's decision on the basis that the [Clerk] presented sufficient evidence to raise issues of fact for hearing on [the Union's] alleged fraud or coercion. Members Coli and Samolis voted to affirm the ALJ's decision for the reasons stated in the RDO. In the absence of a majority vote on the disposition of the RDO, we do not address the substance of the exceptions and leave the ALJ's decision to stand as non-precedential."

¶ 21     The Clerk timely appeals.


                              II. ANALYSIS

¶ 23     On appeal, the Clerk argues that the Board abdicated its responsibility by entering an order that did not contain any reviewable findings. Alternatively, the Clerk challenges the 2 to 2 tie vote by the Board, arguing that the Board erred by convening in the absence of one of its members and allowing the resultant tie vote. The Clerk also argues that the Board's decision was arbitrary and capricious because the Board expressly stated that it did not address the substance of the Clerk's exceptions, in derogation of its statutory responsibility, and it "let stand" the ALJ's recommended decision and order. Finally, the Clerk argues that, substantively, the Board and the ALJ placed a higher burden on the Clerk by requiring that it

initially provide clear and convincing evidence of fraud or coercion, instead of following a two-step process of first determining whether the evidence submitted demonstrated a material issue of fact or law and then conducting an evidentiary hearing to determine whether the evidence was clear and convincing; additionally, the Clerk argues that the ALJ's determination that it had not demonstrated a material issue of fraud or coercion was erroneous. We consider each of the Clerk's contentions in turn.

¶ 24                                A. Standard of Review

¶ 25    As an initial matter, we consider the standard of review applicable to the Board's decision. We review the Board's decision pursuant to the Administrative Review Law. 5 ILCS 315/11(e) (West 2014); 735 ILCS 5/3-101 *et seq.* (West 2014); *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005) (*Council 31*). The Administrative Review Law empowers judicial review of all questions of fact and law presented by the record before the reviewing court. 735 ILCS 5/3-110 (West 2014); *Council 31*, 216 Ill. 2d at 577. The standard of review to be applied depends on whether the question presented is a question of fact, a question of law, or a mixed question of fact and law. *Council 31*, 216 Ill. 2d at 577. The Board's determination of a question of fact is held to be *prima facie* true and correct and will be disturbed only if it is against the manifest weight of the evidence. *Id.* A question of law is subject to *de novo* review (*id.*); however, in the administrative review setting, deference to the agency's experience and expertise is accorded to the agency's interpretation of the law or rule at issue (*Department of Central Management Services/Department of Public Health v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110209, ¶ 16).

¶ 26    A mixed question of fact and law occurs where the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or, in other words, whether the rule of law as applied to the established facts is or is not violated. *Council 31*, 216 Ill. 2d at 577. The Board's decision on a mixed question of fact and law will be disturbed only where it is clearly erroneous. *Id.* A decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* at 577-78. With these standards in mind, we turn to the Clerk's contentions on appeal.

¶ 27                        B. Irregularities in the Board's Decision

¶ 28    The Clerk contends that the Board's decision should not be honored because one of the members was absent. The Clerk argues that the Board did not provide a sufficient reason for that member's failure to vote and that, unlike in a case involving the recusal of a member, the member's failure to vote can be cured by simply requiring the member to vote. This, according to the Clerk, would result in a substantive outcome and is easily accomplished. While we understand the Clerk's contention, we disagree because it is based on an incorrect assumption.

¶ 29    Underlying the Clerk's contention is an unstated but implied assumption that, because one of the Board's members was absent, it improperly convened. Section 5(c) of the Act provides that three members constitute a quorum of the Board and that a vacancy does not impair the right of the remaining members to exercise all of the Board's powers. 5 ILCS 315/5(c) (West 2014). Here, four members participated in the decision, arriving at a tie vote. According to the

Act, the Board properly discharged its responsibilities because the four participating members constituted a quorum and were able to exercise all of the Board's powers.

¶ 30    We note that, where members have recused themselves from a case, Illinois courts have not hesitated to recognize the validity of the panel's decision, so long as a quorum was maintained. See, *e.g.*, *Support Council of District 39 v. Illinois Educational Labor Relations Board*, 366 Ill. App. 3d 830, 833 (2006) (where one member of a five-member panel recused herself, a tie vote ensued, resulting in the adoption of the recommended decision, but the decision was not given precedential effect); *Chicago School Reform Board of Trustees v. Illinois Educational Labor Relations Board*, 315 Ill. App. 3d 522, 527 (2000) (same); *Board of Education of Community Consolidated High School District No. 230 v. Illinois Educational Labor Relations Board*, 165 Ill. App. 3d 41, 53-54 (1987) (*District No. 230*) (recusal of one member from three-member panel did not impair the remaining members from exercising the powers of the Board even if the two members could not agree upon an outcome). Because a quorum was maintained, we cannot accept the Clerk's argument on this point.

¶ 31    We note that the Clerk seizes upon commentary from *District No. 230* as support for its position that a tie is illegitimate. In *District No. 230*, the court noted the potential for difficulty where a three-member panel, set up "without regard for the possibility of conflict, disability, or absenteeism of any one member," would likely result in two-member decisions in which the remaining members took opposing views. *District No. 230*, 165 Ill. App. 3d at 54. The court lamented the lack of a statutory mechanism to empanel a tiebreaking special member, but it recognized that, under the law, the tie vote was required to stand. *Id.* The Clerk suggests that the court's commentary ought to be the basis for invalidating the result here and remanding this cause to the Board with the direction that the absent member vote whether to accept or reject the ALJ's recommended decision and order. However, as noted in *District No. 230*, there appears to be no mechanism in either the Act or the Board's rules to remand for an absent member's vote or to appoint a special member in cases where there was a quorum with an even number of members remaining. See *id.* Instead, we are compelled to accept the result of the quorum exercising the Board's authority. See *id.* Accordingly, we see nothing improper about the Board's tie vote, and we reject the Clerk's suggestion that we invalidate it because there is no basis in the law or the Board's rules that authorizes us to do so.

¶ 32    Next, the Clerk argues that the Board's decision cannot stand because the Board included no findings or conclusions suitable for this court to review. While we might agree that the Board's decision was infelicitously stated, we believe that the clear upshot of its decision was to adopt the ALJ's recommended decision and order as a nonprecedential disposition. See *Support Council*, 366 Ill. App. 3d at 833 (where the remaining members cannot reach a majority decision, the result is the adoption of the hearing officer's recommended decision and order as a nonprecedential disposition). Accordingly, because the Board adopted the ALJ's recommended decision and order, we have sufficient and specific factual findings and legal conclusions to review.

¶ 33    The Clerk also argues that the Board's decision was arbitrary and capricious because the Board stated that it was not addressing the substance of the Clerk's exceptions. Again, this argument is based on the flawed premise that there are not sufficient findings and conclusions for us to review. Again, while its decision perhaps was inartfully stated, the Board clearly adopted the ALJ's recommended decision and order. The ALJ's recommended decision and order addressed the substance of the exceptions, because the exceptions were largely the same as the objections in the response to the Union's petition. Ultimately, the Clerk is arguing that

the inartful form of the Board's decision should trump its substance, the adoption of the ALJ's recommended decision and order. In our view, the ALJ's recommended decision and order adequately addressed the exceptions and provides a sufficient basis for us to review the Clerk's contentions on appeal. Accordingly, we cannot say that the Board's decision was arbitrary and capricious for not addressing the substance of the Clerk's exceptions. For the foregoing reasons, then, we reject the Clerk's contentions regarding the purported formal irregularities of the Board's decision.

¶ 34          C. Burden to Produce Evidence Demonstrating Fraud or Coercion

¶ 35     The Clerk contends that the Board and the ALJ misapprehended and misapplied its own rules when it considered the Clerk's objections alleging that the Union employed fraud and coercion in its attempt to organize the bargaining unit. According to the Clerk, the Board's rules set forth a two-step process in which the party alleging fraud or coercion must first produce sufficient evidence to demonstrate a material issue of fact or law relating to the allegations of fraud or coercion, and then, if that party passes the production hurdle, a hearing will be held to determine whether the evidence of fraud or coercion is clear and convincing. 80 Ill. Adm. Code 1210.100(b)(5) (2004).

¶ 36     The Clerk argues that the Board and the ALJ both compressed this procedure into a single step. First, the Board's notification to the Clerk that the Union had filed a majority-interest petition indicated that, if the Clerk believed that the Union had used fraud or coercion in obtaining its showing of majority support, the Clerk was required to provide clear and convincing evidence of that fraud or coercion with its response to the petition. Second, in her order to show cause, the ALJ directed the Clerk to "[d]emonstrate through specific evidence, case law, and/or legal argument why the [Clerk's] affidavits constitute clear and convincing evidence of fraud or coercion, and/or provide clear and convincing evidence that [the Union] attempted to or actually did obtain support for its campaign through fraud or coercion." Third, in her recommended decision and order, the ALJ stated that, "[i]n sum, the [Clerk] has failed to establish that the Union used fraud or coercion to gain support for its organizing campaign." The Clerk contends that all three of these examples show that the Board and the ALJ employed a single-step process, requiring production of clear and convincing evidence, rather than the two-step process set forth in the Board's rules, requiring a demonstration that a material issue of fact or law exists followed by a hearing to establish whether the Clerk produced clear and convincing evidence of fraud or coercion. The Clerk closes by urging us to remand the cause for a hearing to establish whether the Union used fraud or coercion in its organizing campaign.

¶ 37     In our view, then, the Clerk argues that the Board did not follow its own rules in considering the Clerk's objections to the Union's petition and its exceptions to the ALJ's recommended decision and order. We note that the Clerk does not cite any authority beyond the Illinois Administrative Code in making its argument. We do not imply that the lack of other authority means that the Clerk has forfeited its argument; rather, we note that the lack of other authority means that the Clerk's argument, based on the text of the rule, appears either to be uncorroborated by decisions of the courts or the Board or to present an issue of first impression.[1]

_____

[1]We also note that, in opposing the Clerk's argument, the Union fails to cite any authority directly contradicting the Clerk's argument.

¶ 38    The Clerk's argument presents two separate strands of inquiry for us to resolve. First, we must review the Act and the Board's rules to determine the applicable legal principles. This presents a question of statutory interpretation, which we review *de novo* (albeit with some deference to the Board's experience and expertise in interpreting the Act and its rules). *Council 31*, 216 Ill. 2d at 577; *Department of Central Management Services*, 2012 IL App (4th) 110209, ¶ 16. Second, we must determine whether the Board followed its own rules. This question presents a mixed question of fact and law and is reviewed for clear error. *Council 31*, 216 Ill. 2d at 577 (a mixed question of fact and law occurs where the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or, in other words, whether the rule of law as applied to the established facts is or is not violated). With these principles in mind, we turn to the relevant language of the Act.

¶ 39    Section 9(a-5) of the Act provides:

> "If either party provides to the Board, before the designation of a representative, clear and convincing evidence that the dues deduction authorizations, and other evidence upon which the Board would otherwise rely to ascertain the employees' choice of representative, are fraudulent or were obtained through coercion, the Board shall promptly thereafter conduct an election." 5 ILCS 315/9(a-5) (West 2014).

The Act therefore requires proof of fraud or coercion to be by clear and convincing evidence. The Act does not, however, specify the procedures to be used in proving a claim of fraud or coercion.

¶ 40    In order to effectuate the purposes of the Act, the Board promulgated rules to be observed when a union seeking to organize a group of employees submits a majority-interest petition. The Board's rules provide, pertinently:

> "All employers served with a majority interest petition shall file a written response to the petition within 14 days after service of the petition. The response filed shall set forth the party's position with respect to the matters asserted in the petition, including, but not limited to, the appropriateness of the bargaining unit and, to the extent known, whether any employees sought by petitioner to be included should be excluded from the unit. The employer must also provide at this time clear and convincing evidence of any alleged fraud or coercion in obtaining majority support." 80 Ill. Adm. Code 1210.100(b)(3) (2004).

Regarding allegations of fraud or coercion, the rules provide:

> "(A) A party or individual alleging that the petitioner's evidence of majority support was obtained fraudulently or through coercion must provide evidence of that fraud or coercion to the Board or its agent. If a party has not provided evidence demonstrating a material issue of fact or law relating to fraud or coercion, the Board will certify the union as the unit's exclusive representative if it is determined to have majority support.
>
> (B) If the Board finds a party has provided evidence demonstrating a material issue of fact or law relating to fraud or coercion, it will conduct a hearing to determine whether there is clear and convincing evidence of fraud or coercion. *** If the Board finds clear and convincing evidence of fraud or coercion, the Board will conduct an election in the petitioned[-]for unit to determine majority support for the petitioner. If the Board finds clear and convincing evidence of fraud or coercion to be lacking, it will

- 11 -

determine majority support for the petitioner based upon the evidence filed with the petition." 80 Ill. Adm. Code 1210.100(b)(5) (2004).

¶ 41    The Board's rules delineate its responsibilities in investigating a majority-interest petition:

"Upon receipt of the petition, the Board or its agent shall investigate the petition. If, for any reason during the investigation, the Board or its agent discovers that the petition may be inappropriate, the Board or its agent may issue an order to show cause requesting that the petitioner provide sufficient evidence to overcome the inappropriateness. Failure to provide sufficient evidence of the petition's appropriateness can result in the dismissal of the petition. Moreover, in conjunction with subsection (b)(3), if, for any reason during the investigation, the Board or its agent discovers that the employer's objections to the majority interest petition are insufficient in either law or fact, the Board or its agent may issue an order to show cause requesting that the employer or union provide sufficient evidence to support its defenses. Failure to provide sufficient evidence can result in the waiver of defenses." 80 Ill. Adm. Code 1210.100(b)(6) (2004).

¶ 42    Finally, the Board's investigation of the majority-interest petition will result in one of three outcomes: (1) dismissing the petition (80 Ill. Adm. Code 1210.100(b)(7)(A) (2004)); (2) certifying the petitioning union as bargaining representative (80 Ill. Adm. Code 1210.100(b)(7)(B) (2004)); or (3) scheduling an oral hearing (80 Ill. Adm. Code 1210.100(b)(7)(C) (2004)). Similar to the procedure used to resolve a motion for summary judgment, an oral hearing will occur only if the parties' opposing documents fail to resolve an important question about the petition or, in other words, only if " 'the investigation discloses that there is reasonable cause to believe that there are unresolved issues relating to the question concerning representation.' " *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 773 (2010) (quoting 80 Ill. Adm. Code 1210.100(b)(7)(C) (2004)). In short, the Board will hold an oral hearing "only if it has reasonable grounds for believing that the case presents unresolved issues, significant questions that have resisted resolution through the written submissions." *Id.*

¶ 43    In its argument on appeal, the Clerk entirely ignores subsection (b)(3) and focuses exclusively on subsection (b)(5). The Clerk reads subsection (b)(5) as setting forth a two-step process in which the first step is the production of sufficient evidence to demonstrate a material issue of fact or law relating to fraud or coercion, and the second step is an oral hearing to determine whether there is clear and convincing evidence of fraud or coercion. See 80 Ill. Adm. Code 1210.100(b)(5) (2004). Perhaps unsurprisingly, but certainly disappointingly, the Union, in its counter to the Clerk's argument, entirely ignores subsection (b)(5) and focuses exclusively on subsection (b)(3). According to the Union, the employer is required to provide clear and convincing evidence of alleged fraud or coercion with its response to a union's majority-interest petition. See 80 Ill. Adm. Code 1210.100(b)(3) (2004). From the parties' arguments, the question thus becomes: how are subsections (b)(3) and (b)(5) to be reconciled?

¶ 44    We begin with the Act. The Act defines the quantum of proof necessary to prove an allegation of fraud or coercion, but it does not provide a procedure for the parties and the Board to follow. See 5 ILCS 315/9(a-5) (West 2014) (a party must provide "to the Board, before the designation of a representative, clear and convincing evidence that the dues deduction authorizations, and other evidence upon which the Board would otherwise rely to ascertain the employees' choice of representative, are fraudulent or were obtained through coercion"). When a party succeeds in demonstrating, by clear and convincing evidence, that the

petitioner's evidence of majority support was procured by fraud or coercion, the Board is to promptly conduct an election. *Id.* Thus, the Act specifies that a party must provide clear and convincing evidence of fraud or coercion, and it implies that, procedurally, this clear and convincing evidence is to be presented before the designation of a representative.

¶ 45    *Illinois Commerce Comm'n*, 406 Ill. App. 3d at 771-73, provides a useful overview of the general process for resolving a majority-interest petition. Subsection (b)(3) requires an employer to file a "written response," which lays out the employer's position on issues raised by the petition, and the employer must, in its written response, provide clear and convincing evidence supporting any allegations that the majority support was obtained through fraud or coercion. *Id.* at 771-72. The Board or its agent (*i.e.*, an ALJ) will then investigate the petition. *Id.* at 772. If the investigation uncovers a potential weakness or insufficiency in either party's case, the Board or the ALJ may, through an order to show cause, require the party to provide evidence supporting its position. *Id.* In other words, "if, in the course of his or her investigation, the ALJ encounters what appears to be a legal or factual deficiency in either party's case, the ALJ can require the party to shore up the deficiency by the submission of 'sufficient evidence.' " *Id.* (quoting 80 Ill. Adm. Code 1210.100(b)(6) (2004)).

¶ 46    The goal of these rules is to provide a means to discover, ahead of time and through the parties' documentary submissions, any fatal deficiency in either party's case instead of discovering the deficiency during the administrative hearing and thereby wasting both time and resources. *Id.* Section 1210.100(b) (80 Ill. Adm. Code 1210.100(b) (2004)) thus sets out a procedure that is roughly comparable to the summary-judgment procedure from the Code of Civil Procedure, except that it is the ALJ, rather than the parties, who identifies any deficiencies. *Illinois Commerce Comm'n*, 406 Ill. App. 3d at 772-73. In this fashion, the ALJ may require the parties to participate in the investigation by supplying evidence to overcome or eliminate apparent problems, either factual or legal, that are uncovered in the investigation. *Id.* at 773. This collaborative investigation will result in one of three outcomes: the dismissal of the petition, the certification of the union as the bargaining representative, or the scheduling of an oral hearing. *Id.* The hearing occurs only if the written and evidentiary submissions have failed to resolve a significant issue. *Id.*

¶ 47    The Board's rules, then, implement the Act. The purpose of section 9(a-5) of the Act is to provide a streamlined "card check" procedure for union recognition. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 615 (2008). As part of this streamlined procedure, the Board's rules contemplate the resolution of the employer's objections solely through written submissions. See 80 Ill. Adm. Code 1210.100(b)(3) (2004) (requiring the employer to submit with its written response "clear and convincing evidence of any alleged fraud or coercion in obtaining majority support"). Only if unresolved issues persist after the submission of the parties' written arguments and documentary evidence will an oral hearing be conducted. See 80 Ill. Adm. Code 1210.100(b)(7)(C) (2004) (if the collaborative investigation by the ALJ and the parties "discloses that there is reasonable cause to believe that there are unresolved issues," an oral hearing will be held). Thus, the Board's rules lean toward resolving a majority-interest petition by considering the parties' written submissions, with an oral hearing necessary only if those submissions cannot by themselves resolve the issues raised by the parties and the ALJ's collaborative investigation.

¶ 48    With these principles firmly in mind, we address the Clerk's argument that the Board and the ALJ misapprehended these rules in requiring the Clerk to submit clear and convincing evidence of the Union's alleged fraud or coercion in its organizing campaign, both with the

- 13 -

Clerk's original objections to the petition (*i.e.*, the written response required under subsection (b)(3)) and with the Clerk's response to the ALJ's order to show cause. This argument fails in light of our interpretation of the Act and the Board's rules. The Board's rules clearly required the original response to the petition (or, as denominated by the Clerk in this case, the objections to the petition) to include clear and convincing evidence of the alleged fraud or coercion in the Union's organizing campaign. 80 Ill. Adm. Code 1210.100(b)(3) (2004). Thus, the Board's initial notification properly informed the Clerk that it was required to include clear and convincing evidence with its response to the petition. Likewise, the ALJ's order to show cause also properly informed the Clerk that it was also required to include clear and convincing evidence in its supplemental submission to rectify the weaknesses the ALJ identified in the Clerk's response. Accordingly, we reject the Clerk's argument that the Board and the ALJ erroneously placed on the Clerk a higher burden than that required by the Act or the Board's rules.

¶ 49                    D. Sufficiency of Evidence Demonstrating Fraud or Coercion

¶ 50        The Clerk next argues that it submitted sufficient evidence to demonstrate the existence of material issues of fraud and coercion, which should have required an oral hearing to resolve the issues raised. First addressing fraud, the Clerk argues that the Union promised employees better salaries, better raises, and better vacation benefits. The Clerk also criticizes the ALJ's reasoning that the claim that the Union was not going to charge dues was not "necessarily false" because the Act did "not require bargaining unit members to pay dues, and the Clerk ha[d] not supplied any other evidence on the matter." The Clerk argues that it had only to supply some evidence demonstrating a material issue of fraud. The Clerk contends that in Halle's affidavit it demonstrated a material issue "by showing that the employee was promised that there would be no dues."

¶ 51        We note that the Clerk has not accurately stated the evidence presented in the affidavit. Halle averred that the Union representative "claimed that the raise [she] would get would cover the dues of $40.00 per month." Thus, the Union representative did not promise that there would be no dues charged to employees joining the Union.

¶ 52        The Clerk also refers to Polydoris's hearsay averment that an anonymous employee reported that an unnamed representative told her that "joining the union would be free and there would not be any dues." From this, the Clerk argues that the ALJ used the wrong standard when she stated that hearsay from an unidentified source is "not generally considered clear and convincing evidence." As we saw above, however, the Clerk's response to the petition was required to include clear and convincing evidence to support the Clerk's allegations of fraud. 80 Ill. Adm. Code 1210.100(b)(3) (2004). Accordingly, we cannot say that the ALJ used the wrong standard in evaluating the evidence submitted.

¶ 53        Moreover, we cannot say that second- and third-hand hearsay from unidentified individuals rises to the level of clear and convincing evidence. See *Metropolitan Alliance of Police*, 26 PERI ¶ 59 (ILRB State Panel 2010) (hearsay evidence from anonymous sources is insufficient to meet the clear-and-convincing evidentiary standard of section 9(a-5) of the Act (5 ILCS 315/9(a-5) (West 2014))). The ALJ and the Board determined that the evidence presented by the Clerk simply could not meet the statutory standard of clear and convincing. We cannot say that the Board's decision was clearly erroneous.

¶ 54    The Clerk's arguments disputing the ALJ's recommended decision, adopted by the Board, consist of claims that the ALJ and the Board misapprehended the required procedure and that the Clerk's evidence was sufficient to demonstrate material issues regarding fraud and coercion. As we noted above, however, the Act and the Board's rules both require the submission of clear and convincing evidence when the employer responds to a majority-interest petition. Thus, the Clerk's procedural argument fails.

¶ 55    Regarding the sufficiency argument, the Clerk contends that it presented evidence that, in order to garner support for the Union's organizing campaign, the Union promised that no dues would be charged and that employees would receive better benefits. While the affidavits do, conclusorily, support the Clerk's contentions, in one instance, the person making the claim of fraud is anonymous, and in another, the Union representative's identity and words are not given. As such, the affidavits provide only hearsay and conclusory evidence, and thus we cannot say that the Clerk met its evidentiary obligation. Accordingly, we reject the Clerk's claims that the Union used fraudulent means to obtain majority support.

¶ 56    The Clerk next argues that it provided sufficient evidence that the Union engaged in coercive tactics during its organizing campaign. In particular, the Clerk points to Ventura's affidavit in which Ventura averred that she felt threatened when an identified coworker who was in favor of unionizing texted her that she would be waiting outside to meet with Ventura after work and when an unidentified Union representative came to her dwelling to discuss signing a dues-deduction card. The Clerk also points to Halle's affidavit in which she complained that an unidentified Union representative "appeared to be attempting to use peer pressure and insults" to coerce her into joining the Union. Finally, the Clerk especially highlights Lucio's affidavit in which she averred that the behavior of two unidentified Union representatives was so disturbing that she filed a police report. In particular, the Clerk contends that, for a single mother, the unannounced approach of men during the evening hours was objectively threatening and coercive.

¶ 57    We first note that, despite these claims of coercion, none of the affiants stated that either a Union representative or a coworker either threatened to or actually did retaliate against her. Additionally, and more significantly, despite the claimed coercion, none of the affiants actually reported that she signed a dues-deduction card. Thus, none of the affiants was so subjectively intimidated that her will was overborne and she acquiesced to the purported coercion.

¶ 58    The Clerk repeats its contention that it supplied sufficient evidence to raise a material issue regarding coercion. The Clerk argues that the ALJ and the Board erred in rejecting the evidence as failing to surmount the clear-and-convincing standard when all they should have been doing was to ascertain whether the evidence raised an issue. We have repeatedly addressed this argument in the various guises presented by the Clerk; both the Act and the Board's rules require that the employer present clear and convincing evidence supporting a claim of coercion. Accordingly, we reject the Clerk's argument on that point.

¶ 59    Next, the Clerk suggests that the conduct of the unidentified employees and Union representatives was objectively coercive. While the Clerk correctly notes that the Board has cited no authority indicating what constitutes coercion in a union representation case, the Board has analogized coercion in a representation case to coercion in an unfair-labor-practice case, which measures the allegedly coercive conduct against an objective standard. *Metropolitan Alliance of Police*, 26 PERI ¶ 59 (ILRB State Panel 2010). Thus, the ALJ and the

Board chose the correct rule of law to employ, namely, whether the conduct identified in the Clerk's affidavits was objectively coercive.

¶ 60 The ALJ held that, with respect to the Ventura affidavit, the texts from the coworker and the home visit by the Union representative were not objectively coercive because Ventura was not threatened or warned of impending retaliation if she did not sign a dues-deduction card. Based on the objective standard, we cannot say that the ALJ's and the Board's determination was clearly erroneous.

¶ 61 The ALJ also held that the home visits to the other affiants were not objectively coercive. Although Lucio's affidavit suggested that the Union representatives were stalking her and lying in wait outside of her dwelling, the affidavits provided no other evidence, such as actually threatening words or actions, and included only subjective statements of the affiants' discomfort with the visits. Once again, in light of the objective measure, we cannot say that the ALJ's and the Board's determination was clearly erroneous. Accordingly, we conclude that the Board and the ALJ properly determined that the evidence did not rise to the necessary quantum because the Clerk did not present evidence of threats, retaliation, or other adverse consequences that the affiants would experience unless they signed the dues-deduction cards. We therefore reject the Clerk's coercion argument.

¶ 62 III. CONCLUSION

¶ 63 For the foregoing reasons, the decision of the Board is confirmed.

¶ 64 Confirmed.